## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

      v.                          Case No. 11-CR-264 (JPS)

DAVID PHILLIP FOLEY,

        Defendant.

---

## GOVERNMENT'S TRIAL BRIEF

---

       The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin and Penelope L. Coblentz and Carol L. Kraft, Assistant United States Attorneys, hereby submits this trial brief for the above captioned case.

### SUMMARY OF THE FACTS

**I**      **Introduction**

       The following is a summary of the facts which the government intends to introduce at trial to show that the defendant is guilty of the offenses charged in the six-count indictment, specifically, Distribution of Child Pornography, in violation of Title 18, United States Code, Section 2252(a)(2)(Count 1); Production of Child Pornography, in violation of Title 18, United States Code, Section 2251(a)(Counts 2-4); Transportation of a Minor Across State Lines to Engage in a Sex Act, in violation of Title 18, United States Code, Section 2423(a)(Count 5); and Possession of Child Pornography, in violation of Title 18, United States Code, Section

Case 2:11-cr-00264-JPS     Filed 11/25/12     Page 1 of 23     Document 62

2252(a)(4)(B)(Count 6).

**A.     Distribution and Possession of Child Pornography (Counts 1 and 6)**

On August 16, 2010, Special Agent Eric Szatkowski of the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) was contacted by Bryan Polcyn, an investigative reporter for Fox 6 News, who reported that he had received a cardboard mailer, addressed to the television station. The mailer was delivered to Polcyn's office sometime after he left work on Friday, August 13, 2010, and before he arrived at work on Monday, August 16, 2010. It was sent anonymously, bore a cancelled United States postage stamp, and contained a typed letter and a Phillips brand DVD disc. The letter stated that the sender had discovered the disc in a dumpster to the rear of "Andy Garrison's building at 400 East Silver Spring," and that the sender found the content to be "shocking and disturbing." Polcyn opened the DVD and observed that it contained numerous images of child pornography.

Szatkowski responded to the Fox 6 News TV station and took possession of the mailer, disc and letter. An examination of the disc by Szatkowski and forensic analyst Chris Byars revealed that the disc contained pornographic material in the form of images and videos of young boys engaged in sexually explicit conduct. The images were in a folder with a user profile of "Andy's Favorites, and in a sub-file entitled "Andy Garrison's Private files." The sub-file also contained an additional sub-file entitled "boys," which contained additional child pornography. In total, Byars observed that there were 179 pornographic images and 22 pornographic videos contained on the disc, which include videos contained in the seven files identified in Count 1 of the indictment. Byars determined that the child pornography had been "burned" or copied to the disc on August 10, 2010, just a few days before its delivery to the TV station.

Before and after Polcyn's receipt of the DVD, David Foley advised various acquaintances including Rick Bystra, and David Brozovich that a DVD had been "found" by an unnamed dumpster diver who had been rummaging for useful items in a refuse dumpster located behind his Sport N Cuts barbershop at 402 East Silver Spring, Whitefish Bay, Wisconsin. He told them that the dumpster diver told him that the DVD contained "dirt" on Foley's landlord, Andy Garrison.

Before the DVD was received at the TV station, Foley also told Brozovich that Andy was "going to be in trouble," and that the Brozovich should "watch the news," or words to that substantial effect.

In the months leading up to the receipt of the DVD, numerous persons who were acquainted with Foley heard him complain bitterly about Andy Garrison, who Foley accused of harassing him and interfering with the operation of the Sport N Cuts business. Foley also alleged that Andy Garrison harassed a boy, Minor Male A, who Foley identified as his son.

In early December of 2010, Foley called Bystra and stated that a laptop computer bag had been found behind the barbershop near where Garrison's car had been parked. He informed Bystra that he had removed the computer and plugged it in only to observe that it contained folders with pictures of naked children. Bystra arranged to have his friend, Ronald "Mike" Gull, a private investigator, meet Foley to take possession of the laptop. On approximately December 9, 2010, Gull met Foley at his apartment located on Wilson Street, in Shorewood. Foley told Gull that he found the computer bag outside the barbershop after Andy Garrison had departed from that location and that he was concerned about its contents. Gull observed that the bag contained a manilla folder which contained numerous printed images of children in pornographic poses, a

Toshiba laptop computer, and a white t-shirt with printing advertising a bicycle race which was sponsored by Andy Garrison and his brother. Gull opened the laptop computer, noted that it was not password protected, and that it contained a single word document and a file containing child pornography which was labeled "Andy's Favorites." Gull told Foley that the authorities would be able to determine the IP address of the person who had downloaded the images and that they would also be able to determine the printer which had printed the hard copies of the images in the manilla folders. At that point, Foley became more agitated and suggested to Gull that perhaps Andy Garrison had downloaded the images by parking outside Foley's apartment or had entered the barbershop and printed the images in order to "set up" Foley.

Gull turned the computer bag and its contents over to the FBI on December 15, 2010, and it was subsequently tuned over to Szatkowski.

Investigation revealed that until November 19, 2010, this Toshiba computer was owned by a man named Quentin Hopkins, who posted it for sale on Craig's list. On November 18, 2010, Hopkins' posting was contacted by an inquiry which came from an e-mail account belonging to Foley. Telephone records reflect that thereafter several calls were exchanged between Foley's Sprint Nextel number and a number subscribed to by Hopkins. Hopkins states that on November 19, 2010, in the early afternoon, he sold the computer to the "white guy" with whom he had exchanged messages. This meeting took place at a McDonald's restaurant on Port Washington Road in Glendale, Wisconsin. Child pornography was first uploaded to the Toshiba laptop on November 21, 2010.

DCI Forensic Analyst Andrew Shoeneck analyzed the DVD that was sent to Fox 6 News and the computer recovered from Foley by Gull and compared their contents and artifacts to two

Page 4 of 23

computers that were recovered from Foley's Shorewood apartment during the execution of a search warrant at that location. Schoeneck determined that the computer recovered by Gull on December 9, 2010, contained numerous images of child pornography, including six videos identified by the partial file names 0034.mpg; 0035.mpg,; 0567.mpg; 0568.mpg; inferno-1.mpg; and DIV. . .6.mpg.

The three computers contained numerous images of child pornography and references to images of child pornography that were identical or highly similar to the images on the DVD. Schoeneck concluded that the images on the DVD, which had been downloaded from various child porn web sites, all likely originated from Foley's computers and storage media. Additionally, Schoeneck located references to a folder entitled "Andy Garrison's private files," in the recycle bin of Foley's laptop computer recovered during the search warrant of his home. The folder contained files that were named identical to, and reflected dates corresponding to the files in the folder entitled "Andy Garrison's private files," on the DVD sent to Fox 6 News.

Neither the hard drives onto which the child pornographic images were downloaded nor the DVD onto which they were burned, were manufactured in the State of Wisconsin.

**B.    Production of Child Pornography (Counts 2, 3, and 4)**

Also on the two HP laptop computers recovered from Foley's apartment were four videos of Minor Male A, a fourteen year old boy who Foley had identified to various acquaintances as his son. Schoeneck determined that the first video, which was approximately 54 seconds in length was created or placed on the computer on October 25, 2010. The background indicates that it was created at Foley's Shorewood apartment. In the video, Minor Male A is naked and lying on his back on a massage table. He is masturbating while viewing what appears to be a cell

Case 2:11-cr-00264-JPS    Filed 11/25/12    Page 5 of 23    Document 62

phone with a display screen. On the video, Foley approaches Minor Male A at which time Minor Male A states, "I just cummed," and Foley responds, "you did?"

The second and third videos were created or placed on the computer on January 24, 2011. The two videos are identical and are located on the Temporary Internet files of the Mr. Dave account. Each is approximately 54 seconds in length and is taped in the same apartment. Foley is observed on the video placing the camera upside down between the boy's legs, exposing the boy's genitals while Foley massages the boy's buttocks.

The fourth video was created or placed on the computer on February 24, 2011. The video, which is approximately 36 minutes and 35 seconds in length was also created in Foley's apartment. It depicts Minor Male A, who is naked lying on a massage table. Foley, who is visible in the video, masturbates the boy's penis while giving him a massage. Foley states to Minor Male A, "You can tell me to stop. Just trying to give you a bit of pleasure." The boy's response is muffled and unintelligible.

Schoeneck examined all three computers and their contents and determined that none of the computers holding child pornography were manufactured in Wisconsin.

## C.    Transportation of a Minor Across State Lines to Engage in a Sex Act (Count 5)

On approximately March 18, 2011, Foley drove Minor Male A from the Eastern District of Wisconsin to Minnesota, where the two spent the weekend at a hotel and frequented the Mall of America. Foley told various acquaintances that he was getting away with his son and after the fact, produced various pictures of himself and Minor Male A at the Mall of America.

Minor Male A, who is not Foley's son, recalls the trip as one where he and Foley slept in the same bed and Foley repeatedly attempted to remove his clothing and touch and fondle his

genitals.

Certified hotel records confirm that Foley was a guest at a The Best Western near to the Mall of America the weekend of March 18-20, 2011. Certified business records reveal that Foley used his NetSpend debit card to pay for this hotel stay.

## II. Evidentiary Issues

### A. Presentation to the Jury of Limited Number of Visual Depictions of Minors Subjected to Sexually Explicit Conduct

To prove the crimes charged in this case, the government must prove that the defendant knowingly produced, possessed and distributed visual depictions of minors engaged in sexually explicit conduct. These visual depictions are an integral and essential component of the charged criminal conduct, without which the jury cannot fully assess and evaluate the crimes charged. Accordingly, the government seeks to offer fifteen videos and 28 printed images that were recovered during the investigation of this case. The videos comport with the descriptions set forth in Counts 1 and 6 of the indictment, and the 28 images were contained in a folder located in a computer bag, along with a Toshiba laptop computer that had been purchased by the defendant and used to download child porn. Insofar as defendant may move to exclude the visual depictions under Rule 403 of the Federal Rules of Evidence, such a motion should be denied. Rule 403 provides that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

The rule therefore mandates a balancing of the probative value of the particular evidence against the likelihood of unfair prejudice, confusion, or misleading of the jury, or considerations of judicial economy. That is, relevant evidence is not to be excluded unless its probative value is "substantially outweighed" by the danger of "unfair prejudice." "'Unfair prejudice'" within this context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Committee Note (1972). Rule 403 is "an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence." *United States v. Patterson*, 819 F.2d 1495, 1505 (9th Cir. 1987).

Courts that have addressed this issue have upheld the admission of images of child pornography at trial. *See United States v. Keith*, 440 Fed. Appx. 503, 507 (7th Cir. 2011) (affirming the admission of only 32 or 4,242 images of child pornography as probative of the defendant's possession and his knowledge of possessing such images, even though the defendant had stipulated to their content); *United States v. Hatfield,* 358 Fed. Appx. 692, 695-96 (7th Cir. 2009)(confirming the district court's decision to allow the jury to view 12 videos of child pornography because they were central to the charged conduct); *United States v. Dodds,* 347 F.3d 893, 896-99 (11th Cir. 2003) (affirming admission of 66 images of child pornography taken from defendant's computer because the images showed that they were, in fact, child pornography, that defendant knew they were child pornography, and were probative of defendant's intent); *United States v. Becht*, 267 F.3d 767, 774 (8th Cir. 2001) (holding that 39 images of child pornography were properly admitted, even though defendant offered to stipulate that the images were child pornography because "[o]nly by viewing the images could the jury understand how likely it was that even a glance would have revealed the presence of illegal images"); *United States v.*

*Campos*, 221 F.3d 1143, 1148-49 (10th Cir. 2000) (denying defense motion in limine even though defendant offered to stipulate that the two images shown to the jury were child pornography; such stipulation would "deprive the prosecution of the very opportunity that should be protected: the opportunity to present the 'concrete events of later criminal behavior charged against [a defendant]'") (quoting *Old Chief v. United States*, 519 U.S. 172, 190 (1997); *United States v. Pabon-Cruz*, 255 F. Supp.2d 200, 213-14 (S.D.N.Y. 2003) (affirming admission of child pornography despite defense willingness to stipulate that the images were child pornography; "[t]he actual evidence can do what no stipulation ever could, 'not just prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment'") (quoting *Old Chief*, 519 U.S. at 187-88); *United States v. Dean*, 135 F. Supp.2d 207, 209-11 (D. Me. 2001) (defendant could not exclude images of child pornography by stipulating to them; the sixteen images of child pornography were "undoubtedly a powerful part of the Government's narrative," where it was the government's burden to prove that the images fit within the legal definition of child pornography and that defendant knew that the images he possessed were child pornography).

In *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997), the Supreme Court set forth a balancing test which demands inclusion of the sampling of 15 videos and 28 images of pornography retrieved from the DVD, laptop bag, and computers, even if defendant stipulates as to their content. This Circuit has explicitly stated that arguments based on *Old Chief* are not persuasive in the context to child pornography prosecutions. *Hatfield,* 358 Fed. Appx at 696.  In *Old Chief*, the Supreme Court reiterated the standard rule that "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses

Page 9 of  23

to present it." *Id.* at 186-87.

In *Old Chief*, the Supreme Court noted that although both the stipulation and direct evidence of the defendant's criminal record carried the same evidentiary value, the defendant's stipulation to a prior felony conviction should have been accepted as a substitute to avoid the inherent risk of prejudice in using his record given the nature of the defendant's previous felony. *Id.* at 191. But *Old Chief* is limited to cases where the defendant's status as a felon is at issue." *Hatfield,* 358 Fed. Appx at 696.

The sampling of visual depictions of minors subjected to sexually explicit conduct that were recovered are highly probative with respect to key issues in this case. First, the government needs to prove that the images depict minors subjected to sexually explicit conduct. Second, the government also needs to prove that the defendant knowingly produced, possessed and distributed those images, and, moreover, that the defendant knew that the images depicted minors subjected to sexually explicit conduct. In order to prove defendant's knowledge to the jury beyond a reasonable doubt, it is critical that jurors see images contained in the defendant's computers and on the DVD mailed to Fox 6 News. Once presented with these images, the jury will be able to decide for itself whether anyone viewing the images would recognize, even with just a glance, that these images depict minors, and, further, that the minors are subjected to sex acts or are posed in a sexually provocative fashion, with their genitals or pubic area displayed lasciviously.

The visual depictions of minors subjected to sexually explicit conduct that defendant produced, possessed and distributed are very disturbing, and few people would choose to view them. It should not be presumed, however, that adult jurors, impaneled after an appropriate voir

dire, properly instructed, will decide the case on an improperly emotional basis as a result. The danger of possible unfair prejudice in this regard, the government submits, does not outweigh, must less "substantially outweigh," the critical, probative value of the evidence. Further, it is the jury's task to determine age and pornographic content. A sampling of pictures and videos, culled from hundreds of images, enables the jury to do so and is of suitable size to account for variance of opinion among twelve persons.

## B. Stipulations

Attorney Jeffery W. Jensen, counsel for the defendant, has indicated that there will be no stipulations in this case.

## C. Reciprocal Discovery

The government has requested reciprocal discovery pursuant to Rule 16(b), including but not limited to disclosure of evidence that is in the defendant's possession that he intends to use at trial; the results of any "examinations and tests" that the defendant intended to use at trial; and anticipated "expert" testimony. The government has not received a response to date.

## D. Hearsay Issues

A statement is hearsay if it is (1) an assertion that (2) is made out of court and (3) is offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801©. Many out of court statements are not hearsay because they either are not assertions, or they are not offered to prove the truth of the matter asserted. *United States v. Oguns*, 921 F.2d 442, 449 (2nd Cir. 1990) (questions are not assertions and are thus not hearsay). Furthermore, many statements that meet the definition of hearsay are admissible under one or more of the many exceptions to the hearsay rule.

This section of the Government's trial brief discusses some of the hearsay issues that may arise during the trial.

1.      **Statements Offered for A Non-Hearsay Purpose**

In some cases, the Government may offer out of court statements not to prove the truth of the matters asserted, but merely to explain the subsequent actions of the law enforcement agents or other witnesses. Therefore, the statements would not constitute "hearsay" within the definition of Fed. R. Evid. 801. *United States v. Catano*, 65 F.3d 219, 225 (1st Cir. 1995) (informant's part of conversation with agent was not hearsay, because it was offered for context and not to prove the truth of the informant's statements); *United States v. Lowe*, 767 F.2d 1052, 1063-64 (4th Cir. 1985) (agent's testimony regarding information he received from third party was not hearsay, since it was offered to explain the preparations agents took in anticipation of the accused's arrest). Similarly, a statement offered to show the speaker's state of mind, or to show the effect of the statement on the listener, is not hearsay because it is relevant regardless of its truth.

2.      **Statements of Defendant and/or Defendant's Agents**

Defendant made several statements to investigators in this case, including statements to Special Agents Chris DeRemer and Eric Szatkowski. On September 23, 2010, SA DeRemer and other agents went to the Garrison building in Whitefish Bay to look for Andy Garrison. When they could not locate Andy Garrison, SA DeRemer went into SportNCuts and spoke with the defendant to determine if he knew the whereabouts of Andy Garrison. Foley stated he had not seen Andy Garrison for a few weeks. Foley said he leased the space from the Garrisons and had entered into a 5-year lease on Christmas Eve 2009. Foley said Andy Garrison was "kind of

creepy." Foley said when Foley's 14-year old son was around, Andy Garrison was always petting his son's shoulder. Foley also said likes to hang out with the kids at the ice cream shop next door to SportNCuts. Foley told the agent that the Garrisons organize the International Bike Race. SA DeRemer did not tell Foley why he was looking for Andy Garrison.

On January 24, 2011. Foley told SA Szatkowski that he lived at 4344 Wilson Drive, Apartment 1 in Shorewood, Wisconsin. He provided 414-544-2064 as his cell phone number to Special Agent Szatkowski. Foley said he has been leasing space from the Garrison family for about a year, signing a 5-year lease. Foley described his relationship with the Garrisons as very contentious almost from the beginning. He said Andy Garrison was now going around town trashing his reputation, even distributing flyers about him. A copy of one the flyers was provided to SA Szatkowski. Foley also said that sometime in December of 2010, one of his business associates, Daniel Block, came to the barbershop for one of his usual marketing meetings. He said Block is in the nutritional drink business. Foley said that Block brought in a black computer bag that Block said he just found in the parking lot behind the store, by the Garrison bicycle race van and their old blue rusty Cadillac. Foley said he took a laptop computer out of the bag and turned it on. He said that the computer was not password protected and observed the contents of the desktop. Foley saw the username "Rose."

Foley said he opened one of the files and saw naked pictures of boys and girls. Foley said he freaked out and said that he knew he had to get rid of it. He was concerned about this information becoming public, because it would hurt his business. Foley also feared that he was being set up and that police might be coming in at any minute.

Foley said he talked it over with Block, and decided to call his business partner, Rick

Page 13 of 23

Bystra, for advice. Bystra told him he would call a private detective friend of his, Mike Gull, who would be able to pick up the computer and turn it over to the authorities. Foley said that Gull contacted him about 3 days later, and the computer remained at the barbershop in the interim. Foley said the only other thing he found in the bag was a white t-shirt.

The defendant also made numerous statements to citizen witnesses. When offered into evidence by the Government, defendant's statements are admissible under Federal Rule of Evidence 801(d)(2), which states that a "statement . . . offered against a party" that is "the party's own statement" is "not hearsay."

The Government may offer all, some, or none of defendant's statements at trial under Rule 801(d)(2). Defendant, however, cannot use this rule to offer his own prior out-of-court statements. Rule 801(d)(2) is unavailable to defendant since he is the proponent of the evidence and, where he seeks to introduce it, it is not offered against him. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988). As a result, the hearsay rule would bar the defendant from introducing evidence of his own prior statements. *United States v. Mitchell*, 502 F.3d 931, 964-65 (9th Cir. 2007). If the defendant wants to tell his side of the story, he must take the stand and testify under oath and subject to cross-examination. Indeed, even where the United States elicits the inculpatory portion of defendant's statement from a witness, the defendant is not entitled to elicit the exculpatory portion on cross-examination. *Ortega*, 203 F.3d at 682. The rule of completeness (Fed. R. Evid. 106) has no place in this analysis since it applies only to written or recorded statements. *Id.*

**E.     Interstate Nexus/ Manufacturer's Labels**

As noted earlier, the government will introduce into evidence a Toshiba laptop computer

and two HP computers. The hard drives from these computers bear manufacturer's labels that indicate they were manufactured overseas. The court may accept these labels as proof that the items were manufactured outside the State of Wisconsin.

The interstate or foreign commerce element is satisfied if *any* of the materials used to produce the child pornography were manufactured and/or shipped from outside the state. This includes not only the materials from which the original images were produced, but any materials onto which the child pornography was transferred, copied or converted. *United States v. Angle*, 234 F.3d 326, 340-341 (7th Cir. 2000); *United States v. Smith*, 459 F.3d 1276, 1289 (11th Cir. 2006); *United States v. Maxwell*, 386 F.3d 1042, 1051-1052 (11th Cir. 2004), *reversed on other grounds*.

In assessing whether the Government has satisfied the interstate or foreign commerce element, the Court may consider any manufacturer's markings on the evidence associated with the production of the images. "Inscriptions, signs, tags or labels which indicate workmanship, control or origin" are self-authenticating. F.R.Evid. 902(7).

> Included within this category are brand names, manufacturer and dealer designations, slogans, product names or symbols, and corporate logos. In fact, any earmark of ownership, origin, or control is sufficient. The key is that the feature in question is intended as a mark of the item's provenance.

31 Wright & Miller, *Federal Practice & Procedure* §7141.

In adopting Rule 902(7), the Advisory Committee recognized that:

> several factors justify dispensing with preliminary proof of genuineness or commercial and mercantile labels and the like. The risk of forgery is minimal. Trademark infringement involves serious penalties. Great efforts are devoted to inducing the public to buy in reliance on brand names, and substantial protection is given to them.

Case 2:11-cr-00264-JPS    Filed 11/25/12    Page 15 of 23    Document 62

Advisory Committee Note to 1972 Proposed Rule 902(7). The Committee also recognized that in other contexts, federal law accords substantial weight to labels that indicate foreign origin. Id., citing 19 U.S.C. §1615(2), under which, in the context of forfeiture proceedings, "marks, labels, brands, or stamps, indicative of foreign origin, upon or accompanying merchandise or containers of merchandise, shall be prima facie evidence of the foreign origin of such merchandise."

This argument is even more compelling because federal law requires point of origin labeling on all products imported into the United States. Title19 U.S.C §1304(a) states:

> [E]very article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such a manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.

This statute levies a duty on the importer of any article that is not marked as required. 19 U.S.C. §1304(i). The law also imposes criminal penalties on any person who alters or defaces a point of origin marking with the intent to conceal the information. 19 U.S.C. §1304(l). This law came into effect in the 1930s. Where the law requires point of origin labeling, the self-authentication rule for such labeling is appropriate.

A trade label is self-authenticating provided it "purport[s] to have been affixed in the course of business."

> A trade inscription is "affixed in the course of business" if there was a business purpose for its placement. In the usual case, such a purpose can be assumed since there are many business reasons for placing a mark on a product or piece of property identifying its ownership, control, or origin. Rule 902(7) implicitly makes this assumption by recognizing it is sufficient if the trade inscription merely "purport[s]" to be affixed in the course of business.

Id. The applicability of Rule 902(7) is an issue for the judge to determine under Rule 104(a). Id.

If the conditions precedent to Rule 902(7) are met, the manufacturer's label is self-authenticating. A self-authenticated manufacturer's inscription or label may be accepted as evidence of the item's place of manufacture, satisfying the Government's interstate or foreign commerce element. *United States v. Alvarez,* 972 F.2d 1000, 1004 (9th Cir. 1991).

Moreover, a manufacturer's point of origin label is not hearsay. *Id.* As the court wrote in *Alvarez:*

> In *United States v. Snow*, we held that a red tape imprinted with the defendant's name and affixed to a briefcase in which a gun was found was not hearsay, as the inscription did not constitute an assertion "from which the truth of the matter asserted is desired to be inferred," but rather was a "mechanical trace" and a type of circumstantial evidence not excludable under the hearsay rule. For the same reason, we believe that a similar inscription on the firearm itself does not constitute hearsay. An inscription placed on a firearm by the manufacturer is similarly a mechanical trace and not a statement for purposes of Federal Rule of Evidence 801(c).

Id. (internal citations omitted).

This analysis was applied in a child pornography context. In *United States v. Brown*, Slip Op., 2009 WL 2090193 (S.D.Ind., 7-13-09), the defendant had been charged with possession of child pornography that was produced using materials that had moved in interstate or foreign commerce. The government proposed to satisfy the interstate nexus by introducing the computer hard drive on which the child pornography images were found. The hard drive bore a trade inscription that read "Product of Malaysia."

The court found that the trade inscription was self-authenticating under F.R.Evid. 902(7). *Id.* at *11. It further agreed with *Alvarez* and *Snow* that the trade inscription was merely a mechanical trace, and therefore shouldn't be precluded as hearsay. *Id.* This was particularly true, the court held, where "[t]he inscription of origin is required by law and should be highly

reliable." *Id.*

**F.      Demonstrative Exhibits/Summary Exhibits**

The government may use one or more demonstrative exhibits to help explain various matters to the jury, including techniques used in analyzing the defendant's computer and the DVD mailed to Fox 6 News, the information recovered, and the significance of that information.

Rule 1006 of the Federal Rules of Evidence provides: "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  Fed. R. Evid. 1006.   Such exhibits are admissible as evidence if the underlying materials are admissible and available.

Rule 1006 of the Federal Rules of Evidence provides: "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  Fed. R. Evid. 1006.   Such exhibits are admissible as evidence if the underlying materials are admissible and available to the opposing party for inspection.  *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir.1988)(admitting chart summarizing inventory information from general ledger materials). *See United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir.1988) (admitting chart detailing the long distance calls made by various co-conspirators).   *See also United States v. Baker*, 10 F.3d 1374, 1411 (9th Cir. 1993)("Rule 1006 provides for the use of summaries or charts *as evidence* . . . .") (emphasis in original).  Although the underlying materials upon which the summary testimony is based must be "admissible," they need not be actually admitted into evidence. *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988).  The foundation for admission of such a summary is simply that the records are voluminous and that in-court examination would

Page 18 of  23

be inconvenient.  *United States v. Duncan*, 919 F.2d 981, 988 (5th Cir. 1990).

## G.    Exclusion of Witnesses

Pursuant to Rule 615 of the Federal Rules of Evidence, the government respectfully requests that witnesses be excluded from the courtroom, with the exception of Special Agent Eric Szatkowski, who the Court ruled at the final pretrial would not be subject to the exclusion order. *United States v. Thomas*, 835 F.2d 219, 222-23 (9th Cir. 1987); *see also United States v. Machor*, 879 F.2d 945, 953-54 (1st Cir. 1989).

The government may ask the court to release witnesses from the requirements of the sequestration order after their testimony if it is clear that they will not be recalled to provide additional evidence at a later point of the trial.

## H.    Admission of Certified Business Records

The government will introduce into evidence certified business records from the Best Western Hotel, NetSpend Corporation and Sprint Nextel.  The records have been properly certified by written declarations from their custodians asserting that the records were made at or near the time of the occurrence of the matters set forth by or from information transmitted by a person with knowledge of those matters, were kept in the course of regularly conducted activity and were made by the regularly conducted activity as a regular practice, in compliance with Fed. R. Evid. 902 (4), 902(11) and 803(6). The hotel records will show that the defendant was a registered guest at a Minnesota Best Western Hotel on March 18 and 19, 2011, consistent with Minor Male A's anticipated testimony that the defendant took him across state lines to Minnesota on those dates.

The NetSpend records will reveal that Foley used his NetSpend debit card to pay for the

Case 2:11-cr-00264-JPS    Filed 11/25/12    Page 19 of 23    Document 62

hotel room at Best Western in Minnesota.

The Sprint Nextel records will document telephone calls between the defendant and Quentin Hopkins who, after a Craig's List posting, sold the defendant the Toshiba laptop, which the defendant subsequently used to possess child pornography images.

## I.    Use of Audio Recordings and Transcripts

The government will seek to admit and play for the jury a recording of a telephone conversation between the defendant and Minor Male A, made while the defendant was an inmate at the Milwaukee County Jail. Minor Mail A will provide the foundation for the admission of this evidence. He will testify that he recognizes his voice and the voice of the defendant. The recording will be played during the testimony of Minor Male A. The government has redacted a portion of the recording which reveals the defendant was in custody.

The trial court, upon clear and convincing evidence that recording is a true, accurate, and authentic recording of a given conversation, has broad discretion to admit the recording in evidence. *United States v. Keck*, 773 F.2d 759, 766 (7th Cir. 1985); *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir. 1984). Furthermore, only in extraordinary circumstances can the trial court's determination be overturned on appeal. *Id.*

In addition, trial courts have wide discretion to allow the jury to use written transcripts as an aid in understanding audio recordings. *E.g.*, *United States v. Camargo*, 908 F.2d 179, 183 (7th Cir. 1990); *United States v. Doerr*, 886 F.2d 944, 966 (7th Cir. 1989); *Keck*, 773 F.2d at 766. The Seventh Circuit has "repeatedly . . . approved" the practice of allowing the jury to use written transcripts during deliberations, as well as when the recordings are first played during trial, particularly if the jury is instructed to resolve any discrepancies between the recordings and

the transcripts in favor of the recordings. *Camargo*, 908 F.2d at 183 (collecting cases); *see also Doerr*, 886 F.2d at 966.

The partial inaudibility of a recording renders it inadmissible only if the inaudibility casts into doubt the trustworthiness of the entire recording. The determination of trustworthiness rests within the sound discretion of the trial judge. *United States v. Degaglia*, 913 F.2d 372, 378 (7th Cir. 1990); *Camargo*, 908 F.2d at 183; *Zambrana*, 841 F.2d at 1327.

The government has previously provided the defendant with copy of the recording.

## J.  Chain of Custody Standards

Physical exhibits are admissible upon a showing that they remain in substantially the same condition as when the alleged offense took place, and the trial court's determination of this preliminary question may be reversed only if it constitutes a clear abuse of discretion. *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988); *United States v. Jefferson*, 714 F.2d 689, 695 (7th Cir. 1983); *United States v. Aviles*, 623 F.2d 1192, 1197 (7th Cir. 1980). Since a "presumption of regularity" attends physical specimens in the custody of public officials, the government need not, in offering them, present a perfect chain of custody that excludes all possibilities of tampering. *Lott*, 854 F.2d at 250; *Jefferson*, 714 F.2d at 696; *Aviles*, 623 F.2d at 1198. In fact, the government is required to show only that it took "reasonable precautions" to preserve the evidence and that there is a "reasonable probability" that the evidence has not been altered in any material respect. *Lott*, 854 F.2d at 250; *United States v. Olson*, 846 F.2d 1103, 1116 (7th Cir. 1988); *Aviles*, 623 F.2d at 1198. To the extent that gaps exist in the chain of custody, they would affect the *weight* rather than the admissibility of the physical exhibit in question. *Lott*, 854 F.2d at 250; *United States v. Shackleford*, 738 F.2d 776, 785 (7th Cir. 1984);

Page 21 of 23

*Jefferson*, 714 F.2d at 696; *United States v. Lampson*, 627 F.2d 62, 65 (7th Cir. 1980).

## K. Defendant's Criminal History

Should Defendant take the stand, the Government may seek to introduce evidence of his criminal convictions within the past 10 years. Defendant has been convicted of one count of felony issuance of worthless checks in 2008; one count of unauthorized use of an entity's identification to obtain credit in 2011; two counts of felony bail jumping, one count of felony issuance of worthless check and one count of felony theft - false representation in November, 2012.

By taking the stand, a criminal defendant puts his credibility in issue. *United States v. Blackshear*, 568 F.2d 1120, 1121 (5th Cir.1978). Pursuant to Rule 609 of the Federal Rules of Evidence, evidence that an accused has been convicted of a crime punishable by death or imprisonment in excess of one year is admissible to impeach if its probative value outweighs its prejudicial effect. F.R.Evid. 609 (a)(1).

In making a Fed. R. Evid 609 (a)(1) determination, courts have considered a variety of factors including the kind of crime involved, when the conviction occurred, the importance of the defendant's testimony to the case, and the importance of the defendant's credibility. *United States v. Preston*, 608 F.2d 626, 637-39 (5th Cir. 1979), *United States v. Mahone*, 537 F.2d 922, 927-29 (7th Cir. 1976).

For these reasons, should the Defendant testify, the Government should be permitted to impeach him with evidence of the negotiating convictions

## III. Conclusion

The government is not aware at this time of other legal issues that are likely to arise

during the course of this trial.

Dated this 23 day of November, 2012 at Milwaukee, Wisconsin.

Respectfully submitted,

JAMES L. SANTELLE
United States Attorney

By:
s/PENELOPE L. COBLENTZ
Assistant United States Attorney
Bar Number:
s/CAROL L. KRAFT
Assistant United States Attorney
Bar Number: 1000117
s/PRIYA BARNES
Law Intern
Attorneys for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: penelope.coblentz@ usdoj.gov
E-Mail: carol.kraft.@usdoj.gov